IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

SPARTANBURG DIVISION

| | |
|---|---|
| Michael Williams, )<br><br>Plaintiff, )<br><br>vs. )<br><br>Intier Automotive Interiors of America, )<br>Inc. )<br><br>Defendant. ) | Civil Action No. 7:09-1144-JMC-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

   This matter is before the court on the defendant's motion for summary judgment (doc. 99).  In his third amended complaint, the plaintiff alleges causes of action against the defendant, his former employer, for race discrimination under Title VII of the Civil Rights Act of 1964, as amended, and 42 U.S.C. § 1981, retaliation, and breach of contract (doc. 77).

   Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Rule 73.02(B)(2)(g), D.S.C., all pretrial matters in employment discrimination cases are referred to a United States Magistrate Judge for consideration.

## FACTS PRESENTED

   The plaintiff, who is an African-American (Pl. resp. m.s.j. at 16), began his employment with the defendant as a Quality Manager, effective January 2, 2008, with a starting base salary of $95,000 per year (Pl. dep. 134, Dx. 15).[1]  The plaintiff went through the defendant's orientation on January 2, 2008, and reviewed the Magna Employee Charter

---

[1]Three of the plaintiff's depositions are referenced in this report.  The initial deposition is referenced as "Pl. dep.," the second deposition on the plaintiff's breach of contract claim is referenced as "BOC dep.," and the deposition taken of the plaintiff in his companion lawsuit against Omega Laboratories, arising from the same facts, is referenced as "Omega dep."  All other deposition transcripts are referenced using the last name of the deponent.  The deposition exhibits submitted by the defendant are referenced as "Dx.," and the plaintiff's exhibits are referenced as "Pl. resp. m.s.j., ex."

and Magna International Employee Charter, which discussed fair treatment, communication, the employee hotline, reporting problems anonymously, and equal employment opportunity (Pl. dep. 144-47; Dxs. 19-20; Fife dep. 16, 19-20).  The plaintiff was familiar with the defendant's open door policy, which discussed the hotline and an e-mail address for reporting problems (Pl. dep. 147-49; Dx. 21).

The plaintiff received a copy of the defendant's Employee Handbook shortly after his employment began.  The plaintiff was aware the defendant had a random drug testing policy in the employee handbook (Pl. dep. 149-50).  He knew that the drug testing policy in the handbook, issued in May 2007, stated that a positive drug test would result in the employee being discharged (Pl. dep. 150-51, 155; BOC dep. 73-74).

Tom Heiman replaced the interim General Manager, Heinz Krabbenhoeft, on July 2, 2008 (Heiman dep. 9-10; Omega dep. 83).  As part of his new position, Heiman reviewed the policies and procedures and decided to change the drug testing policy, which he believed was too stringent, in order to allow those who tested positive to remain employed rather than be immediately terminated (Heiman dep. 30-31; Omega dep. 83).  On July 7, 2008, Heiman reviewed for implementation a revised drug testing policy ("the Revised Policy"), which was more lenient and allowed employees with a positive drug test a "second chance" (Pl. dep. 153-55; Dx. 22).  The Revised Policy stated in pertinent part:

> Associates who test positive for any illegal substance or alcohol may be given a second chance to improve their life and become a better associate, [sic] this is a one time offer that may be given to the associate and any additional positive results, or failure to complete a substance abuse program, or denial of help offered will result in termination of employment.
>
> ***
>
> Any associate testing positive and depending on their job title, will be removed from their current position and offered an additional position within the company.

(Dx. 22 at 2-3).

2

The plaintiff denies ever seeing the Revised Policy until his deposition on February 10, 2010 (Pl. dep. 152-53; Dx. 22; BOC dep. 79-80).  Since the plaintiff, as Quality Manager, was responsible for putting revised or new policies into the company systems, and the plaintiff never saw the written policy, the plaintiff does not believe the policy was distributed (Pl. dep. 156).  The plaintiff understood that the defendant sets the policies in the Handbook, as well as other policies in the facility, and was free to change the policies at any time (Pl. dep. 296; BOC dep. 77).

The plaintiff does not dispute that management can schedule random drug screenings of associates at any time, without notification (Pl. dep. 152).  He admits he has no personal knowledge about how the random drug and alcohol screenings are administered (Pl. dep. 151).  The plaintiff was chosen for random drug testing on July 8, 2008, and provided a hair sample for testing because he was unable to produce enough urine for a urine test (Pl. dep. 156, 158, 217).

After Human Resources received positive test results for the plaintiff and a Caucasian Business Unit Manager, Heiman discussed the matter with Human Resources Manager Nicole Tomasek and Safety and Environment Coordinator Mike Fife, and a decision was made to demote both employees, enroll them in EAP, and adjust their pay rates (Pl. dep. 207-208; Heiman dep. 42-43; Tomasek dep. 7; Fife dep. 10-11, 52-53).[2]  The positive drug test report for the plaintiff was signed by a Medical Review Officer ("MRO") (Dx. 24 at Innertech 000170).  Heiman testified that the MRO is a third party contracted to conduct a review of the test results (Heiman dep. 38-40).

On July 21, 2008, Heiman, Tomasek, and Fife met with the plaintiff and told him that he failed the drug test and the action the defendant was going to take under the Revised Policy, which was implemented the day before the plaintiff's drug test (Pl. dep. 188;

_____

[2]  Fife was responsible for scheduling the random drug tests, which were administered by Regional Occupational Health ("ROH")(Fife dep. 11).  The employees are selected for testing by ROH, not by the defendant (Tomasek dep. 42).

Omega dep. 35-36, 41-42; BOC dep. 6, 8; Fife dep. 49-50; Heiman dep. 45).  The July 21 meeting was the first time the plaintiff became aware of the Revised Policy (Omega dep. 33; BOC dep. 13-14).  The plaintiff states that although the policy was discussed, he did not see the written policy and was not given a copy of the written policy before his demotion or at any time during his employment (Pl. dep. 152-53, 156; BOC dep. 9, 76-77, 79-80).  The plaintiff was only told the effective date of the policy and that the policy applied to him (BOC dep. 9-10).  According to the plaintiff, he was told the policy gave him a second chance to demonstrate he was a good employee and "make it right," but that if he refused the EAP classes, he would be terminated. *Id*.  The plaintiff was told he could be tested randomly at any time. *Id.*

During the July 21 meeting, the plaintiff was given a document detailing that he was being offered a position as a Quality Engineer, a demotion from his Quality Manager position, as allowed under the Revised Policy, and that his salary was reduced to $76,000 per year as a result in the change to the Quality Engineer position (Pl. dep. 188, 192, 194-95; Dxs. 22, 26; Omega dep. 42).

The plaintiff was told he would be required to participate in the Employee Assistance Program ("EAP"), a requirement of the Revised Policy (Pl. dep. 191-92, 194; Dx. 22, 26).  The plaintiff told Fife and Tomasek that he had never used drugs and that the results were either incorrect or not his results (Pl. dep. 189; Omega dep. 43-44; BOC dep. 13).

The decision to demote the plaintiff and refer him to EAP had already been made before the meeting on July 21, and the offer letter and EAP referral were already prepared (Pl. dep. 198-99; Dx. 26).  The plaintiff does not dispute that the defendant was provided with the positive test results and those results were not in question until he disputed them in the meeting on July 21, after the decision to demote him had already been made (Pl. dep. 199-200, 206).  The plaintiff admits that he cannot dispute that the

4

defendant thought the positive test results were accurate and relied upon them when the decision to demote him was made (Pl. dep. 205-206; Fife dep. 30, 51).

At the conclusion of the July 21 meeting, the plaintiff told Heiman that he was going to get an independent test (Pl. dep. 192). ROH told the plaintiff it could not retest the original sample without the defendant's permission or request, but referred the plaintiff to another testing facility. *Id.* The plaintiff admits that he does not know if the defendant has ever consented to have anyone's result retested (Pl. dep. 214). The plaintiff had hair and urine samples collected at AccuDiagnostics[3] on July 21, 2008, and the sample was analyzed by LabCorp (Pl. dep. 193, 208-209; Dx. 28; BOC dep. 23-24). The results of this test were negative, and the plaintiff claims this proves that the original positive result was inaccurate (Pl. dep. 203-204).[4] The plaintiff does not know if the tests performed by Omega and LabCorp were the same (Omega dep. 49).

The plaintiff returned to the defendant with the results from the July 21 LabCorp urine test. Heiman told the plaintiff to take the results to Human Resources but did not make any promises about what action would be taken (BOC dep. 25-26, 33). The plaintiff states that a few days later he gave the negative hair test results to Fife and Tomasek, but they rejected his request to restore him to his Quality Manager position (BOC dep. 27-28).

Heiman first discussed the Revised Policy at the monthly employee meeting on August 27, 2008, over one month after the plaintiff was demoted and had his pay reduced (Heiman dep. 31-32; Tomasek dep. 32; Fife dep. 25; Omega dep. 83-84; BOC

---

[3] The plaintiff's July 8 sample was collected by ROH and analyzed by Omega Laboratories, Inc. ("Omega").

[4] The plaintiff claims an expert he retained in his lawsuit against Omega would state that the original reports from Omega show that the original test should have been reported as negative (Pl. dep. 199). The plaintiff admits that he is relying on his expert's interpretation of documents from Omega to show the original test was in error (Pl. dep. 202). Omega's Laboratory Director disputes this (*See* Dr. David Englehart aff. ¶¶ 3-4).

5

dep. 14-19, 36; Dx. 37, 38). Heiman testified that the employees were told during the meeting that as a part of the new policy, an employee who tested positive would be allowed a chance to remain employed, but could be demoted and/or have compensation reduced (Heiman dep. 32-33). An employee with a positive test would be given a second chance, but if any subsequent test were positive for drugs, the employee's employment would be terminated (BOC dep. 38-39). The plaintiff cannot recall Heiman specifically mentioning how the second chance would affect position, pay, or demotion, but the plaintiff testified that he inferred that pay and position would not be affected (BOC dep. 36-38).

Heiman testified that although the Revised Policy does not allow the plaintiff to dispute the test results, and that opportunity is not given to any employee, the plaintiff did dispute the results (Heiman dep. 37, 45-46, 71, 73-74). According to Heiman and Fife, the second chance is not an opportunity to dispute the test or be retested, only a more lenient policy than the one in effect prior to the plaintiff's random test, providing a chance to avoid termination, through a demotion, despite a positive result (Heiman dep. 37; Fife dep. 35-36). The plaintiff testified in his deposition that it was only after his demotion that the Revised Policy was presented to employees, and "[i]t just said you'd have a second chance" (Omega dep. 84). The plaintiff admits that it was only his interpretation of the policy that an employee would be allowed to dispute the test:

> I assume second chance means you've got a second chance to – either it could mean refute the test. It could mean you had a second chance to retain your position and continue to perform your duties. That's the interpretation I got from it.

(Omega dep. 84). Shawn Pauley, a Quality Engineer for the defendant, testified that under the Revised Policy as explained by Heiman he thought that an employee who had a positive drug test would be entitled to take a second test or to have the original specimen retested (Pauley dep. 37-40).

6

Heiman and Fife saw no evidence that the original test was wrong (Heiman dep. 47, 55-57; Fife dep. 63). Heiman testified he could not rely on the second test performed by the plaintiff because he believed it was too easy to cheat the drug test when you are prepared for it, which is the reason why the defendant conducts random testing (Heiman dep. 67). Fife talked to Omega to have them confirm the results of the initial test, and Omega assured him that the reported positive results were correct (Fife dep. 40; Omega dep. 45). Fife believed that subsequent drug tests of the plaintiff taken during the EAP program were negative not because the first test was wrong, but because the EAP program was working (Fife dep. 62-63). Fife did not believe that the negative second test, conducted 13 days later, was a reason to dispute the positive results (Fife dep. 37-38; Pl. dep. 209-210). Fife believes the positive July 8 test was accurate and that the plaintiff smoked or otherwise ingested marijuana, which resulted in a positive test (Fife dep. 63). The plaintiff testified that Fife's reaction when he presented him with the negative test results indicated that Fife did not believe the results of the second test (Omega dep. 50).

The plaintiff testified in his deposition that when he turned in performance reviews he prepared for the employees subordinate to him, he questioned Human Resources about whether all performance reviews were due on July 1, 2008. He was told they were (Pl. dep. 227-28, 253). The policy regarding these reviews was outlined in January or February 2008 in Performance Review Training by Hannah Parker, the defendant's former Human Resources Manager, who stated the reviews were due on July 1, 2008 (Pl. dep. 221). The Employee Handbook states that "[i]t is Innertech Spartanburg's goal that during the first 12 months of your employment, performance reviews will take place as follows: (1) Prior to the end of your introductory period; (2) At the end of six months; and (3) At the end of 12 months (Pl. resp. m.s.j., ex. 3 at 16). The offer letter to the plaintiff stated that after a 90 day introductory period the plaintiff's performance "shall be reviewed and a decision made whether or not you shall remain a full-time employee" (Pl.

resp. m.s.j., ex. 18). The offer letter further stated that his base salary would "be reviewed annually in accordance with applicable policy" and that the "timing and amount of any adjustment to your Base Salary will depend on your overall performance and the financial performance of the Company during the preceding fiscal year, the first of such reviews to occur January, 2009" (Dx. 15). The plaintiff received his only performance review on March 27, 2009 (Dx. 32). Quality Engineer Todd Brown, a Caucasian employee, testified that he received a review after his probationary period and another review sometime in 2009 (Brown dep. 14-16). Quality Engineer Shawn Pauley, also a Caucasian, testified that he received a performance review in May 2009, which was eight or nine months after he started his job (Pauley dep. 19-20). Randy Keough, the Quality Manager who replaced the plaintiff, testified that the performance reviews are required for raises and promotions (Keough dep. 127).

The plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") dated October 24, 2008, alleging race discrimination based on a failure to receive a performance review on July 1, 2008, and his demotion to Quality Engineer following his positive drug test (Pl. resp. m.s.j., ex. 20). The plaintiff claims that after he filed the charge the defendant demoted him to "menial lab tech work" that was not required of other salaried employees (Pl. resp. m.s.j. at 14).

On March 27, 2009, Keough prepared a performance evaluation of the plaintiff (Dx. 32). Keough found that the plaintiff needed improvement in four of the areas reviewed. Keough further noted that the plaintiff needed "to determine if he wants to become a contributor or remain a bystander here at Innertech," and he recommended assertiveness training for the plaintiff. *Id.* The plaintiff disagreed with the review and testified that it was racially motivated in retaliation for the EEOC charge because of the "inaccuracies within the Review" (Pl. dep. 259, 267-68). He claims the evaluation adversely affected his employment because "[i]t affects your raises, your promotions, your bonuses, and the

8

opportunity for growth" (Pl. dep. 268). The plaintiff admits that he does not know if Keough knew he had filed a charge or had ever complained of race discrimination (Pl. dep. 259-60). Keough testified in his deposition that he knew nothing of the plaintiff's EEOC charge at the time he prepared the performance evaluation and only became aware of the charge after the instant action was filed (Keough dep. 120-21).

The plaintiff filed the initial complaint against the defendant on May 1, 2009. He was terminated from employment by the defendant on May 15, 2009 (Pl. dep. 276-78). The defendant did not contest the plaintiff's claim for unemployment (Tr. 279-80). According to the defendant, the plaintiff's termination was part of a reduction in force, and he was selected for the reduction by Quality Manager Keough based upon all Quality Engineers' most recent performance evaluations (Keough dep. 38-39, 136-139; Heiman dep. 25-26). Another Quality Engineer, Bill Cantanese, a Caucasian who had never complained of discrimination, filed an EEOC charge, or a lawsuit against the defendant, was also selected.

On April 8, 2009, nine months after the random drug test of the plaintiff, the plaintiff, through his counsel, had the original July 8 sample retested by Omega (Pl. dep. 211-12, Dx. 25 at 5437-5438). The plaintiff admits he does not know how the delay in retesting for nine months might affect the sample (Pl. dep. 213). The retest was negative. Omega could not determine the reason for the discrepancy and did not opine as to which result was accurate (Pl. dep. 210-11, 214-16; Dx. 25 at Innertech 005437). The Laboratory Director for Omega provided Fife with a letter stating that numerous studies demonstrate that the compounds found in hair as a result of smoking marijuana "degrade and/or are absorbed into their storage containers/ devices over time under all storage conditions" (Dx. 25 at Innertech 005435-005436).

The plaintiff filed a second EEOC charge dated December 19, 2009, in which he claimed that his assignment to Quality Technician duties in addition to his Quality Engineer duties, and the termination of his employment, were retaliatory (Dx. 33).

## APPLICABLE LAW

Federal Rule of Civil Procedure 56 states, as to a party who has moved for summary judgment: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist that give rise to a genuine issue. *Id.* at 324. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson,* 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir. 1985), *overruled on other grounds,* 490 U.S. 228 (1989). "Only disputes over facts

10

that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248.

## ANALYSIS

### *Race Discrimination*

In his third amended complaint, the plaintiff alleged that the defendant discriminated against him based upon his race in the review, bonus, and promotion process and in accepting the "dubious drug test . . . instead of pursuing an investigation to ensure the accuracy of the original test" (doc. 77). The plaintiff has apparently abandoned his claim that his demotion based upon the positive drug test was discriminatory as he does not address it in his response in opposition to the motion for summary judgment (*see* Pl. resp. m.s.j. 16-21). As such, summary judgment should be granted on that claim. Accordingly, the court will address only the plaintiff's claim of discrimination in the denial of performance reviews.

For the plaintiff to establish a *prima facie* case of race discrimination, he must show: (1) that he is a member of a protected class; (2) that he suffered an adverse employment action; (3) that at the time the employer took the adverse employment action he was performing at a level that met his employer's legitimate expectations; and (4) that the adverse employment action occurred under circumstances that raise a reasonable inference of unlawful discrimination. *Jones v. Calvert Group, Ltd.*, C.A. No. DKC 06-2892, 2010 WL 5055790, at *6 (D. Md. 2010) (slip copy).

Under the burden-shifting method of proof of *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), if the plaintiff can establish a *prima facie* case, the burden then shifts to the defendant to produce a legitimate, nondiscriminatory reason for its actions against the plaintiff. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253-54 (1981) (this is a burden of production, not persuasion). If the defendant meets this burden, the plaintiff must

11

show by a preponderance of the evidence that the proffered reason was pretextual. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000). In *Reeves*, the Supreme Court reiterated that evidence of pretext, combined with the plaintiff's *prima facie* case, does not compel judgment for the plaintiff, because "[i]t is not enough ... to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." *Id.* at 146-47 (*quoting St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519 (1993)) (emphasis in original). However, the Court also stated that, under the appropriate circumstances, "a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* It is the plaintiff's burden to create an inference that the defendant's proffered reason is a pretext for intentional discrimination. *See id.* at 147-48. Pretext analysis does not convert Title VII into a vehicle for challenging unfair – but nondiscriminatory – employment decisions. *Holder v. City of Raleigh*, 867 F.2d 823, 828 (4th Cir. 1989). Conclusory allegations, without more, are insufficient to preclude the granting of the defendant's summary judgment motion. *Ross*, 759 F.2d at 365.

Here, the plaintiff alleges that he was entitled to performance reviews after 90 days, six months, and 12 months of employment, and the denial of such reviews was based upon his race. The defendant argues that the plaintiff cannot show an adverse employment action because he cannot identify any specific raise, bonus, or promotion that he did not get because he did not receive performance reviews at the times he contends he was entitled (Def. m.s.j. at 15-17). The plaintiff conceded such in his deposition (Pl. dep. 258). The plaintiff counters that he was damaged because he lost the *opportunity* to receive a promotion, raise, or bonus, and also because he lost the ability to point to past positive reviews when the defendant terminated him based upon negative performance (Pl. resp. m.s.j. at 20-21).

12

The defendant counters that the review after an employee's introductory period, which is mentioned in the Employee Handbook, was to determine if new employees would retain their employment, which the plaintiff clearly did (Fife dep. 23; Dx. 40 at Innertech 000216). Further, with regard to the alleged six months performance review, Heiman became General Manager on July 2, 2008 (Heiman dep. 9-10), around the same day such a review of the plaintiff's performance would have been due. Thus, he would not have had sufficient experience with the plaintiff to review his performance. Further, the plaintiff's offer letter only mentioned one performance review, the annual performance review due in January 2009, which was just two months before Keough reviewed the plaintiff's performance.

The plaintiff points to Todd Brown and Shawn Pauley as comparators (Pl. resp. m.s.j. at 20). Quality Engineer Brown, a Caucasian employee, testified that he received a review after his probationary period and another review sometime in 2009 (Brown dep. 14-16). Quality Engineer Pauley, also a Caucasian, testified that he received a performance review in May 2009, which was eight or nine months after he started his job (Pauley dep. 19-20). On the other hand, the plaintiff was a Quality Manager at the time he contends his 90 day and six month performance reviews were due.[5] Thus, Pauley and Brown were not in the same position the plaintiff held at the relevant time. The plaintiff received his annual performance review two months after his first anniversary of employment (at which time he was a Quality Engineer). While the plaintiff contends that performance reviews for all employees were due on July 1, 2008 (Pl. dep. 221), he cannot specifically name anyone who received a review in July 2008, and he does not know if anyone received a pay increase on July 1, 2008 (Pl. dep. 229, 256). Based upon the

---

[5]The plaintiff began his job as Quality Manager on January 2, 2008, and was demoted to Quality Engineer on July 21, 2008.

evidence provided, the plaintiff has not shown that he was denied performance reviews under circumstances that raise a reasonable inference of unlawful discrimination.

Assuming for purposes of this motion that the plaintiff could establish a *prima facie* case of race discrimination, this court finds that the plaintiff has failed to meet his burden of showing pretext. The plaintiff contends that the "denial of reviews is part of a larger culture of race discrimination" at the company (Pl. resp. m.s.j. at 7). As evidence of pretext, he cites the testimony of a former Human Resources Manager, Hannah Parker, who testified that Gary Justice, a former Interim General Manager, asked her in November or December 2007, "How does it feel to be on this plantation down here?" When she asked what he meant, he replied, "All the black people are out on the floor and all the white people are up front. You're the only one up here. How do you feel about that? (Parker dep. 82-83). Parker also sued the defendant for race discrimination in this court, and her case was dismissed on summary judgment on January 4, 2011. *See Parker v. Magna Innertech-Spartanburg*, C.A. No. 6:09-cv-00773-JMC. As argued by the defendant, the plaintiff has shown absolutely no connection between the statement cited by Parker and the plaintiff's claim regarding his denial of performance review. The individual that Parker claims made the statement, Gary Justice, is not one of the persons that the plaintiff claims should have reviewed his performance, and the plaintiff has shown absolutely no connection between the comment and the alleged denial of timely performance reviews. The evidentiary value of a comment like that cited by the plaintiff is measured by when and how it was made:

> A court may also consider stray comments that provide circumstantial evidence of discriminatory animus, in combination with other evidence. *See Warren v. Fort Lincoln Cemetery, Inc.*, No. 00-419, 2001 WL 743199 (D. Md. June 26, 2001) (holding though employer's racial slurs were not direct evidence of discriminatory intent, the employer's "conduct may still support Plaintiff's case as circumstantial evidence of discriminatory animus" by employer). The Court may weigh these stray comments in deciding whether a discriminatory animus is the most likely explanation for a plaintiff's termination.

14

> *See Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23, 36 (1st Cir.2001) ("[T]hough such 'stray remarks' may be material to the pretext inquiry, 'their probativeness is circumscribed if they were made in a situation temporally remote from the date of the employment decision, or ... were not related to the employment decision in question, or were made by nondecisionmakers.' ").

*Huang v. Gutierrez*, C.A. No. AW-08-2882, 2010 WL 93274, at *10 (D. Md. January 5, 2010) (slip copy). Here, the remark cited by the plaintiff is "too generalized and removed from the employment decision to support a finding of pretext in [his race] discrimination claim, without other supporting evidence." *Id.* at *11.

The plaintiff also cites "statistical evidence" that he claims permits an inference of discrimination. Specifically, the plaintiff cites the defendant's answers to interrogatories stating that the plaintiff and Parker are the only two African-Americans to have been employed in management positions with the defendant since 2000, and both were terminated from employment (Pl. resp. m.s.j. at 23, ex. 17). However, as argued by the defendant, the plaintiff's "evidence" falls woefully short of the standard required for admissible statistical evidence, and, in this exact context, such evidence has been specifically rejected by the Fourth Circuit Court of Appeals. *See Carter v. Ball*, 33 F.3d 450, 456 (4th Cir. 1994) (holding that the lack of minority employees in upper-level positions was insufficient to prove discrimination absent a comparison with the relevant labor pool for those positions).

The plaintiff has failed to demonstrate evidence upon which a reasonable factfinder could find that he was discriminated against because of his race in the denial of timely performance reviews. Accordingly, summary judgment should be granted on this claim.

### *Retaliation*

The plaintiff alleged in his third amended complaint that the defendant took adverse action against him in retaliation for filing his first EEOC charge and the complaint in the instant case by demoting him to menial lab tech work, giving him an unjustified negative evaluation, and terminating his employment (doc. 77).    Section 1981 encompasses claims of retaliation.  *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 457 (2008).  To establish a *prima facie* case of retaliation under Title VII or Section 1981, the plaintiff must prove:  1) he engaged in a protected act; 2) an adverse employment action was taken against him; and 3) there is a causal connection between the protected act and the adverse employment action.  *See Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 258 (4th Cir. 1998).  The adverse action need not be an ultimate employment decision, but must be "materially adverse," meaning "'it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Prince-Garrison v. Maryland Dep't of Health & Mental Hygiene*, C.A. No. 08-1090, 2009 WL 667421, at *3 (4th Cir.2009) (quoting *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).  The standard for demonstrating a materially adverse employment action is less stringent for a retaliation claim than it is for a substantive discrimination claim. *See Burlington*, 548 U.S. at 67.  Nevertheless, a plaintiff is still required to demonstrate actual harm or injury caused by the retaliatory conduct.  *Id.*

The plaintiff filed a charge of discrimination with the EEOC dated October 24, 2008.  As noted above, on March 27, 2009, Keough prepared a performance evaluation of the plaintiff in his position as Quality Engineer (Dx. 32).  Keough found that the plaintiff needed improvement in four of the areas reviewed.  Keough further noted that the plaintiff needed "to determine if he wants to become a contributor or remain a bystander here at Innertech," and he recommended assertiveness training for the plaintiff. *Id.*  The plaintiff

16

disagreed with the review and testified that it was racially motivated in retaliation for the EEOC charge because of the "inaccuracies within the Review" (Pl. dep. 259, 267-68).

The plaintiff claims he was asked to perform laboratory technician duties beginning in April 2009 (Pl. dep. 271). He claims this was retaliatory because no other salaried employee had these duties (Pl. dep. 273-74). The plaintiff admits he was assigned these duties because a Quality Technician position was eliminated, but he does not know who made the decision or what factors were considered in the decision (Pl. dep. 272-73; BOC dep. 29-30). The plaintiff's title, pay, supervisor, and workplace did not change, and he continued to perform his Quality Engineer duties (Pl. dep. 271-72; BOC dep. 32). Keough testified that he assigned the plaintiff these duties because the plaintiff was the only one of the Quality Engineers who had the time for the additional responsibility (Keough dep. 146). Keough did not know about the plaintiff's EEOC charge or lawsuit at the time he assigned these duties to the plaintiff or when he prepared the plaintiff's performance review (Keough dep. 120-21; Pl. dep. 259-60).

The court will assume for purposes of this motion that both the negative performance review and the assignment to laboratory technician duties were adverse employment actions. However, the plaintiff cannot connect any protected activity to these actions, and thus he cannot meet the third element of a *prima facie* case of retaliation. Here, the evidence shows that the decisionmaker in the assignment of the plaintiff's duties and his performance review did not know about the plaintiff's EEOC charge. The plaintiff has absolutely no evidence that either of these actions was retaliatory in nature. *See Cornelius v. City of Columbia, S.C.*, C.A. No. 3:08-2508-CMC-JPG, 2010 WL 4366187, at *3 (D.S.C. Sept. 16, 2010) (noting that is necessary for a plaintiff to show that decisionmaker was aware of the protected activity at the time the alleged retaliation occurred) *adopted by* 2010 WL 4348133 (D.S.C. Oct. 27, 2010). Furthermore, even if the plaintiff could establish a *prima facie* case, he has failed to present evidence that the stated

17

reasons for these actions were pretext for retaliation. Accordingly, summary judgment should be granted on these claims.

The plaintiff further alleges that he was terminated from employment in retaliation for filing the instant lawsuit. As noted above, the plaintiff's first EEOC charge was dated October 24, 2008, and his complaint was filed on May 1, 2009. He was terminated from employment on May 15, 2009. According to the defendant, the plaintiff's termination was part of a reduction in force, and he was selected for the reduction by Quality Manager Keough based upon all Quality Engineers' most recent performance evaluations (Keough dep. 38-39, 136-139; Heiman dep. 25-26). The two Quality Engineers selected for termination from employment were Bill Cantanese, a Caucasian who had never complained of discrimination, filed an EEOC charge or a lawsuit against the defendant (Keough dep. 38-39, 138-39; Heiman dep. 25-26). Keough made the recommendation that the plaintiff's and Cantanese' positions be eliminated, and General Manager Heiman made the final decision (Keough dep. 38-39, 124-26; Heiman dep. 28; Fife dep. 60). Keough was unaware of the plaintiff's EEOC charge and lawsuit until the Fall of 2009 (Keough dep. 120-22). Heiman did not know about the plaintiff's EEOC charge or that a complaint had been filed in the instant action until he received the notice to appear to give his deposition in this lawsuit (Heiman dep. 28-30). The only individuals that the plaintiff can show knew about the charge and lawsuit were Nicole Tomasek, the Human Resources Manager at the time of his demotion, and Mike Fife, Tomasek's successor (Heiman dep. 28-29; Tomasek dep. 11-12, 14-15; Fife dep. 14). These individuals testified, and Keough and Heiman confirmed, that they were not involved in the decision to terminate the plaintiff's employment (Keough dep. 38-39; 124-126; Heiman dep. 28; Fife dep. 60; Tomasek dep. 40). While the plaintiff contends that Fife was the decisionmaker because he informed the plaintiff of his termination (Pl. resp. m.s.j. at 14), Fife testified that he was not involved in the decisionmaking process and only put the paperwork together, and the plaintiff conceded

18

that he knew nothing about the decisionmaking process that led to the termination of his employment (Pl. dep. 279; Fife dep. 60).   The plaintiff's speculation is insufficient to overcome the overwhelming evidence that the only two persons involved in the decision to terminate his employment did not know about his protected activities.   Furthermore, the plaintiff has presented no evidence that the stated reason for the plaintiff's termination from employment was pretext for retaliation.   Based upon the foregoing, the plaintiff's retaliation claim should be dismissed.

### Contract

The plaintiff alleged in his third amended complaint that the Employee Handbook created a contract for "progressive discipline and a fair chance to correct problems" (doc. 77).  He further alleged that in July 2008 Heiman made certain promises pertaining to drug screening.  Specifically, the plaintiff claimed he was "promised that he would be provided a company physician with specific training to interpret and evaluate all positive test results in addition to evaluating the medical history to consider alternative explanations for a positive result."  He further alleged he was promised "he would be given a fair means by which to challenge . . . any erroneous drug . . . test" and that the policy "included full and fair opportunity to dispute a 'false positive' either through a second test or retest" of the original specimen, including reinstatement if the test was, in fact, erroneous (doc. 77).  The plaintiff claimed that the promises, expectations, and benefits offered to him in or around July 2008 that created a contract of employment are the policies in the Employee Handbook, Employee Charter, and statements made in the July 21 demotion meeting, and the August 27 employee meeting (BOC dep. 20-21).

"To recover for a breach of contract, the plaintiff must prove the existence of: (1)  a binding contract; (2)  a breach of contract; and (3)  damages proximately resulting from the breach." *Manios v. Nelson, Mullins, Riley & Scarborough, LLP*, 697 S.E.2d 644, 655 (S.C. Ct. App. 2010) (citing *Fuller v. E. Fire & Cas. Ins. Co.*, 124 S.E.2d 602, 610 (S.C.

1962)).   A contract is formed by an offer, acceptance, and consideration. *Roberts v. Gaskins*, 486 S.E.2d 771, 773 (S.C. Ct. App.1997).

The plaintiff first argues he was entitled to progressive discipline as a contractual obligation (BOC dep. 45).  The defendant's progressive discipline policy in the Employee Handbook states as follows:

> If there is a problem with your performance or conduct, here are the steps normally taken to help you correct it: 1. Counseling… 2. Verbal Warning… 3. Written Warning… 4. Suspension… 5. Discharge… The stages of progressive discipline exist to help you correct any difficulties you are having on the job. However, if a serious incident occurs, the Company may skip steps in the progressive disciplinary process and can move directly to written warnings, suspensions and/or discharge without the need for prior disciplinary action.

(Dx. 40 at Innertech 000221-222).

Only "[m]andatory, progressive discipline procedures may constitute enforceable promises." *Hessenthaler v. Tri-County Sister Help, Inc.*, 616 S.E.2d 694, 698 (S.C. 2005) (internal citations omitted).  As argued by the defendant, the South Carolina Supreme Court has determined that words such as "guiding policy," "not required," and "may" are permissive in nature. *Horton v. Darby Elec. Co.*, 599 S.E.2d 456, 461 n.7 (S.C. 2004); *see also Grooms v. Mobay Chem. Corp.*, 861 F. Supp. 497, 505 (D.S.C. 1991) (vague and unspecific language cannot create a binding employment contract); compare *Conner v. City of Forest Acres*, 560 S.E.2d 606, 611 n.4 (S.C. 2002) ("will be" and "shall be" are mandatory in nature).  Here, the progressive discipline policy uses permissive language including "normally," "however," "may," and "can," rather than mandatory language such as "will" and "shall" (Dx. 40 at Innertech 000221-222).  Accordingly, this court finds that the policy is not mandatory and thus does not constitute an enforceable promise.  Accordingly, the breach of contract claim on this issue fails.

The plaintiff also argues that the defendant breached a contract with him to treat him fairly because of the following policy statements: (1) Magna International Inc.'s Employee Charter provides, "Magna is committed to an operating philosophy which is based on fairness and concern for people" (Def. reply, Ex. G); and (2) The Fairness Committee Policy provides, "Your Fairness Committee also helps ensure Innertech Spartanburg's policies, rules, and procedures are consistently followed and employees are treated fairly" (Def. reply, Ex. F). As the South Carolina Supreme Court found in *Hessenthaler*, however, such a general policy statement does not support a breach of contract claim:

> The provision provides:
>
> > [The defendant employer] is an equal opportunity employer. All decisions, including hiring, training, and promotion, are made without regard to race, color, religion, national origin, sex, age, handicap, sexual preference, or any other protected status.
>
> We hold that this provision does not constitute a promise altering the at-will employment relationship and giving rise to a breach-of-contract claim. *See McKenzie v. Lunds, Inc.*, 63 F.Supp.2d 986, 1003 (D.Minn.1999) (holding that nondiscrimination policy statements in employee handbook are legally insufficient to sustain a breach-of-contract claim; such policies are too indefinite to form a contract between employer and employee); *Cherella v. Phoenix Technologies Ltd.*, 32 Mass.App.Ct. 919, 586 N.E.2d 29, 31 (1992) (holding that an equal opportunity policy announced in an employee handbook did not establish contractual rights supporting a breach-of-contract claim). Unlike a mandatory, progressive discipline procedure, a general policy statement of nondiscrimination does not create an expectation that employment is guaranteed for any specific duration or that a particular process must be followed before an employee may be fired.

616 S.E.2d at 698. Here, like the nondiscrimination policy at issue in *Hessenthaler*, the defendant's fairness policy does not promise "specific treatment in specific situations," and thus it is not enforceable in contract. *See id.*

The plaintiff also argues that the Revised Policy regarding drug testing was breached by the defendant because "[u]nder this policy, a 'company physician' was supposed to be the sole party that determined a positive result and was to have specific training to evaluate and consider alternative explanations for a positive result" (Pl. resp. m.s.j. at 2; BOC dep. 20-21).  The provision at issue provides:

> DEFINITIONS:
>
> ***
>
> D. Medical Review Officer (MRO): The company physician(s) responsible for receiving results of testing. This physician has specific training to interpret and evaluate all positive test results in addition to evaluating the medical history to consider alternative explanations for a positive result. This may require an interview with the employee either by phone or in person. This physician(s) possesses a certification as a Medical Review Officer.
>
> E.  Positive Test: A positive screen indicates a certain level of sensitivity for a tested substance.  A positive test is determined solely by the MRO.
>
> ***

(Dx. 22).

It is undisputed that the plaintiff first learned of the Revised Policy at the July 21, 2008, meeting in which he was told that he had tested positive for drugs (Pl. dep. 155-56), and he did not see the Revised Policy until his deposition in this lawsuit (Pl. dep. 152-53; BOC dep. 79-80).  The Revised Policy was also discussed in the August 27th employee meeting (BOC dep. 9-10, 14-19, 36).   However, the plaintiff testified that he does not remember the words "medical review officer" or "MRO" being used in either the July 21 or August 27 meetings (BOC dep. 78-80, 96).  Accordingly, as argued by the defendant, the plaintiff could not have relied on the "company physician" language he cites, and thus he cannot establish the proximate causation element of his *prima facie* case. *See Moss v. Abbeville*, 740 F.Supp.2d 738, 754 (D.S.C. 2010) ("[N]o such claim can lie where the

22

employer has not actually distributed or published the handbook to the plaintiff—communicated the offer.") (citing *Taylor v. Cummins Atlantic*, 852 F.Supp. 1279 (D.S.C.1994)).

The plaintiff next argues that Heiman made oral assurances at the July 21 meeting that constitute enforceable promises (Pl. resp. m.s.j. 12-14).  Specifically, the plaintiff claims he could rely on Heiman's assurances that the Revised Policy applied to him, that he would be provided with a "company physician" to review the results of the drug tests, an opportunity for a retest of a disputed drug test, and an opportunity for reinstatement if a test was erroneous (Pl. resp. m.s.j. at 12-13).  However, the plaintiff testified in his deposition that at the July 21st meeting Heiman only told him to take the second drug test to Human Resources, but he never promised any specific recourse, including reinstatement or retest of the original sample (BOC dep. 25-26, 33, 68-69).  The plaintiff admits that it was only his *impression* that he would have an opportunity to get his position and pay back (BOC dep. 32).

Similarly, the plaintiff claims that when he showed the negative results of the hair sample to Fife and Tomasek a few days later, and he asked if he could have his job back, they declined (BOC dep. 27-28).  Nothing in his conversation with Fife and Tomasek amounts to any promise or guarantee to the plaintiff.  He took the additional test on his own, was not asked to have it done by the defendant, and was not told that it would affect the outcome of the demotion in any way (BOC dep. 25-28).  Fife never made any promises to the plaintiff about the drug test. Fife and Tomasek only said that they would discuss it, but they never promised the plaintiff anything (BOC dep. 69-70).  Accordingly, the plaintiff has failed to show specific oral assurances upon which he relied to his detriment.

Based upon the foregoing, summary judgment should be granted on the plaintiff's contract claims.[6]

## CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, this court recommends that the defendant's motion for summary judgment (doc. 99) be granted.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

November 8, 2011
Greenville, South Carolina

---

[6]In the motion for summary judgment, the defendant addressed several other policies that the plaintiff claimed had been violated, including the open door policy, help from the Fairness Committee, advancement opportunities policy, performance review policy, competitive wages and benefits policy, open communication policy, and Employee Charter policy (Def. m.s.j. at 2-5, 28-31). The plaintiff appears to have abandoned those claims as he addressed in his opposition to the motion for summary judgment only those claims discussed herein (Pl. resp. m.s.j. at 2-6, 8-13).